(C. D. 582)

Samuel Shapiro & Co. et al. *v.* United States

United States Customs Court, Second Division

(Decided January 15, 1942)

*Tompkins & Tompkins* (*J. Stuart Tompkins* of counsel) for the plaintiffs.
*Paul P. Rao,* Assistant Attorney General (*James F. Donnelly* and *Dorothy C. Bennett,* special attorneys), for the defendant.

Before Tilson, Kincheloe, and Dallinger, Judges

Dallinger, Judge: These are suits against the United States, arising at the ports of Baltimore and Cleveland, brought to recover certain customs duties alleged to have been improperly exacted on particular importations of metal swivels, snaps, eye handles, and chains. In protest 969713–G, the collector of customs at the port of Baltimore is informed that "protest is hereby made against your ascertainment

and liquidation of duties, and your decision assessing duty under the Tariff Act of 1930, at 35%, or 40%, or 45% or 50% on chains or chain fasteners and similar merchandise." But according to the invoice covered by said protest no item of merchandise was assessed at 35, 40, or 50 per centum ad valorem. However, certain hooks, eye handles, and swivels on that invoice were assessed with duty at the rate of 45 per centum ad valorem under paragraph 397 of said act as articles composed in chief value of base metal not plated with platinum, gold, or silver and not specially provided for. That same classification was applied to all of the articles covered by protest 6025–K.

It is claimed that all of the articles covered by both protests are properly entitled to free entry under paragraph 1604 of said act as parts of agricultural implements; or alternatively, that they are dutiable at the rate of 35 per centum ad valorem under the provision in paragraph 345 of said act for "snaps   *   *   *   swivels, and all other articles of iron, steel, brass, composition, or other metal, not plated with gold or silver, commonly or commercially known as harness hardware."

The latter claim was not pressed by counsel for the plaintiffs. As a matter of fact, at the first hearing, held at Cincinnati, Ohio, on November 19, 1940, the plaintiffs' claims were limited to the last two items on the invoice covered by protest 969713–G, to wit, 10,000 swivels contained in case 3883 and invoiced at 20.50 marks per thousand and the 10,000 swivels contained in case 3884 and similarly invoiced at 20.50 marks per thousand; and in the case of protest 6025–K, to the first six items on the invoice covered thereby, to wit, No. 35/40 swivels, No. 30 swivels, No. 27 swivels, No. 35a snaps, No. 30 snaps, and No. 25 snaps.

It was also stipulated by and between counsel for the respective parties that all of the foregoing articles were composed of base metal not plated with gold or silver.

At said hearing the plaintiffs offered in evidence the testimony of three witnesses, in the course of which samples of the imported merchandise at bar were admitted in evidence as exhibits 1 to 7, inclusive, and certain samples of tie-out or picket chains and cow chains in the manufacture of which the imported snaps and swivels were used, together with certain catalogs, were admitted in evidence as illustrative exhibits A to H, inclusive.

The first witness, John M. Schaumloffel, senior member of the Cincinnati Pump Manufacturing Co., the ultimate consignee of the merchandise involved herein, after identifying exhibits 1 to 7 and illustrative exhibit A, testified in part as follows:

By Mr. Tompkins.

Q. Do you sell the swivels and snaps by themselves?—A. We do not.

Q. What use do you make in your business of the swivels and snaps as represented by Exhibit 1, Illustrative Exhibit A, and Exhibits 2 to 7 inclusive?— A. They are used in the manufacturing of tie-out chains.

Q. Are they used exclusively for that purpose?

\*       \*       \*       \*       \*       \*       \*

The WITNESS. We manufacture these chains for the purpose of being used in the tying out, or staking out of grazing animals, especially for the purpose of tying out cows and cattle, calves.

By Mr. TOMPKINS.

Q. What I am asking is whether the swivels and the snaps as represented by the exhibits that I have mentioned are used exclusively by you for the purpose of making tie-out or picket chains, or are they used also for some other purpose?— A. In our use 96 or 97 per cent are used exclusively in tie-outs.

Q. And the remaining 4 per cent?—A. The remaining 4 per cent are used in the manufacture of cow-ties. I should say 3 per cent are used in cow-ties, and 96 per cent for tie-outs.

\*       \*       \*       \*       \*       \*       \*

Judge DALLINGER. What is the difference between a tie-out chain and the one you say is used for cows?

The WITNESS. The tie-out chain is used in tying cattle out for grazing, and the cow-tie is used for tying the cow in the stable.

\*       \*       \*       \*       \*       \*       \*

At this juncture illustrative exhibits B, C, D, and E were admitted in evidence as representing tie-out or picket chains, in the manufacture of which the plaintiff firm used the imported snaps and swivels.

The witness then proceeded to testify that said tie-out or picket chains varied in length from 15 to 70 feet, 30 feet being the length most frequently called for by the witness' customers; that he had sold at wholesale approximately 3,000 dozen tie-out or picket chains similar to illustrative exhibits B, C, D, and E each year during the past 5 years throughout the southern part of the United States; that during the last 35 or 40 years he had continuously observed the use of such tie-out or picket chains; that they were used for tying out or staking out cattle for grazing purposes on farms; and that he had so used them himself. Asked to describe the purpose of the swivel which is a part of each of the illustrative exhibits B, C, D, and E, the witness stated:

One end of the chain is fastened to a post or stake, and as the cow moves around the stake, unless a swivel was in the center, every 10 or 20 feet, the chain would soon twist itself into a ball, and this swivel prevents the tangling or rolling up of the chain.

He then proceeded to testify that illustrative exhibits F and G were representative samples of cow chains or cow ties, and that illustrative exhibit H illustrates how a tie-out or picket chain and cow chain are actually used.

On cross-examination the witness testified in part as follows:

X Q. Do you manufacture articles different from Illustrative Exhibits B to G, which contain Exhibits 1, 2, 3, 4, 5, 6, or 7, or Illustrative Exhibit A?—A. At

least 95 or 96 percent go into the manufacturing of tie-out chains, and cow-tie chains.

X Q. Which are identical to or similar to Illustrative Exhibits B to G, which you see here on the floor?—A. Yes, sir.

X Q. And what do you manufacture of the other three or four per cent?—A. On another style, we manufacture dog chains.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Isn't it a fact that in the early years of your use of Exhibits 1 to 7, and Illustrative Exhibit A, that that merchandise was utilized in connection with the manufacture of dog chains?—A. It was not.

X Q. Was any of it so used?—A. A very small per cent.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Does your firm publish catalogues of its products?—A. We do.

Being shown one of his company's catalogs, which was admitted in evidence as defendant's illustrative exhibit I at the request of counsel for the Government, the witness then proceeded to mark with the letter A items wherein exhibits 1 to 7 and illustrative exhibit A were illustrated. He then proceeded to testify in part as follows:

X Q. Have you ever known of the use of Illustrative Exhibits B, C, D, or E for dog leads, dog chains, dog tie-outs?—A. Yes.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Your company has never sold them?—A. Not for any other purpose except tie-out chains.

X Q. For cows?—A. Cows and cattle.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Were you ever present in a hardware store when merchandise represented by Illustrative Exhibits B, C, D, or E, was sold as a dog chain?—A. No.

X Q. Or dog tie-out?—A. I have not.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Do I understand your testimony correctly that merchandise containing the smaller sized snaps, 25 I believe, and the smaller sized swivels, also 25——?—A. 27.

X Q. And contained in the illustrative exhibits, is strong enough for a cow tie-out chain?—A. It is, depending upon what kind of a cow. A Holstein cow is very rambunctious, and a Jersey cow can almost be tied to a very small chain without fear of breaking.

X Q. But as a general practice, would you sell merchandise which contains a number 25 snap, or a number 27 swivel, in combination, as a cow-tie-out chain?—A. Sold as a cow tie-out chain.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Have you seen snaps like 35 or 35a used on dog leads?—A. No.

X Q. Have you ever sold any chains containing number 35 for dog leads or dog chain purposes?—A. Not to my knowledge.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Isn't it a fact that you have sold merchandise identical to or similar to Illustrative Exhibits B to E to various hardware dealers, or pet shop dealers, or

other such affiliated dealers, and invoiced them as dog leads, or dog chains?—A. In probably 2 or 3 instances in the past 5 years.

* * * * * * *

On redirect examination the witness, being shown a chain which was admitted in evidence as plaintiff's illustrative exhibit K, testified that that was known as a dog chain the world over. He then identified another chain, which had been admitted in evidence as plaintiff's illustrative exhibit L, as a cow chain or cow-tie.

On recross-examination he testified that he had seen a chain like illustrative exhibit K hold a police dog, an Irish setter, a Great Dane, and a St. Bernard dog.

On re-redirect examination he testified in part as follows:

R. R. Q. I observe that in your catalogue marked Illustrative Exhibit 1, the Hercules halters and dog chains are listed together. Are those separate and distinct articles?—A. Distinct.

R. R. Q. Are the dog chains there listed all made from wire, including snaps and swivels smaller than those involved in this suit?—A. They are.

The plaintiffs' second witness, Veach C. Redd, a retail hardware dealer of Cynthiana, Ky., for the past 20 years, being shown illustrative exhibits B, C, D, and E, testified that they were cow tie-out chains, and being shown illustrative exhibits F and G stated that they were cow chains; that he had sold similar chains to farmers and knew how they were used; that they were all used for tying cattle on farms; that he knew of no other substantial use made thereof; and that all of such articles were sold to farmers and to no one else.

On cross-examination the witness testified in part as follows:

X Q. Did you intend to convey the impression that you sold merchandise with the same size snap and swivel as is contained in Illustrative Exhibits B to E?—A. Yes, sir.

X Q. But of a different length of chain?—A. I don't know what lengths these are.

X Q. I believe the record shows that some of these are under 30 feet in length.—A. We don't carry anything under 30 feet.

X Q. Have you sold merchandise which is included in Illustrative Exhibits B to E, which is of a chain strength of Illustrative Exhibit D?—A. Yes, sir.

* * * * * * *

X Q. Do you know of your own knowledge whether or not there are hardware dealers who handle merchandise like Exhibits 1 to 7, and Illustrative Exhibit A, as separate entities not connected up with any chain?—A. No.

* * * * * * *

X Q. Have you ever seen merchandise like Exhibits 1 to 7, and Illustrative Exhibit A, without being connected up with any chain, used for any purpose?—A. No, I haven't.

The third plaintiffs' witness, Frank Garrison, shipping clerk in the employ of the Cincinnati Pump Manufacturing Co. for the past 4

years, testified that prior to that time he had had general charge of a large farm in the State of Tennessee; that in that capacity he had purchased tie-out or picket chains similar to those represented by illustrative exhibits B, C, D, and E for tying-out purposes; that said chains, as an integral part thereof, have snaps and swivels similar to exhibits 1 to 7 and illustrative exhibit A; that he also used in his farm work cow chains or cow ties similar to illustrative exhibits F and G for the purpose of tying up cows while milking or while in stall overnight; that the lighter-gauged chains are used mostly for Jersey cows and the heavier-gauged for Holsteins and Guernsey; that he had never known of chains containing snaps similar to those represented by exhibits 1 to 7 being used for any other purpose than for tie-out or cow chains; and that he had never observed any other use for the swivels and snaps except as parts of tie-out or cow chains.

At the second hearing, held at New York on March 10, 1941, the Government offered in evidence the testimony of two witnesses. The first, Francis A. Diel, general manager of the Bridgeport Chain Manufacturing Co. of Bridgeport, Conn., manufacturers of weldless chain and chain fittings, who testified that plaintiffs' exhibits 5, 6, and 7 represent a common type of snap used with weldless chain; that his company has been engaged in the manufacture of similar snaps during the last 20 years; that each snap has a spring and a so-called snap pin; that the gauge of the wire in the snap pin determines the strength and utility of the snap; that the diameter of the snap pin in illustrative exhibit 7 is .174 of an inch, whereas the diameter of the snap pin in the snap manufactured by the witness' company, and admitted in evidence as defendant's illustrative exhibit M, over objection of counsel for the plaintiffs, is .177 of an inch; that the diameter of the snap pin in illustrative exhibit 6 is .216 of an inch whereas the diameter of the snap pin in the snap manufactured by the witness' company, and which was admitted in evidence as defendant's illustrative exhibit N is .207 of an inch; that the diameter of the snap pin in illustrative exhibit 5 is .236 of an inch whereas the diameter of the snap pin manufactured by the witness' company, and admitted in evidence as defendant's illustrative exhibit O, is .296 of an inch; that illustrative exhibit 1 is known as a center swivel; that the swivel manufactured by the witness' company and admitted in evidence as illustrative exhibit P, although apparently considerably smaller and shorter, nevertheless was in the opinion of the witness similar to plaintiffs' exhibit 1; that a swivel manufactured by the witness' company and admitted in evidence as defendant's illustrative exhibit Q, was approximately of the same gauge as plaintiffs' exhibit 4; that snaps and swivels similar to illustrative exhibits N to Q, inclusive, had been sold by the witness throughout the United States and are particularly

used on dog chains, dog leads, dog runner chains, exerciser chains, tie-out chains, and cow chains; that in his opinion plaintiffs' exhibit 7, similar to illustrative exhibit N, was not suitable for use in the manufacture of tie-out chains or cow chains, for the reason that it has not sufficient strength; that his company's sale of dog chains containing snaps similar to illustrative exhibit M exceeded 3,000 dozen per year for the last 7 years; that the witness' company has sold chains containing snaps or swivels identical with illustrative exhibit N, illustrations of which are shown on pages 115 to 121 of the witness' company's catalog which was admitted in evidence as defendant's illustrative exhibit R; that during the year 1940 60 per centum of all the snaps manufactured by the witness' company were used on dog chains; and that the same percentage was true during the years prior to 1930; that about half of the swivels represented by defendant's illustrative exhibits M, O, P, and Q were used for tie-out chains and the remaining half for dog runner or kennel chains.

On cross-examination the witness testified that the largest-sized snaps and swivels manufactured by his company are chiefly used in the manufacture of picket, tie-out, or cow chains; that his company did not use a swivel as heavy as plaintiffs' illustrative exhibit A; that his company did not make a chain similar to illustrative exhibit K; that plaintiffs' illustrative exhibit L is a cow tie; that some of the smaller sizes or weaker chains with smaller swivels can be and are used as a tie-out for a bull when a ring is put through the bull's nose, in which case a heavy chain is not required.

The second Government witness, Edwin J. Trevethan, salesmanager at the plant of the American Chain Co., located at York, Pa., testified that he was familiar with tie-out and cow chains as well as with dog chains; that he was thoroughly familiar with snaps similar to the plaintiffs' exhibits 5, 6, and 7 and with swivels similar to plaintiffs' exhibits 1, 2, 3, and 4.

The witness then proceeded to testify in part as follows:

Q. Will you please examine the swivels in the case at bar, Exhibits 1 to 4 inclusive, and state which one of those, in your opinion, compares or is similar to that swivel?—A. There are different types of swivels.

Judge KINCHELOE. Which one is similar to yours?

The WITNESS. Ours simply has a different design, but it does exactly the same work. Ours, here, would probably fall between those two.

By Mr. DONNELLY.

Q. Between Exhibit 1 and Exhibit 2?—A. In size it does. Of course, when it comes to strength one would not know.

Q. What is that article which you hold in your hand?—A. That is what you call a dog runner chain.

\* \* \* \* \* \* \*

Q. Your swivel is a triangular piece of metal whereas the swivel on the imported merchandise is bell-shaped?—A. Our idea is to have something distinct. Instead of a bell-shape, we make ours triangular.

Judge KINCHELOE. You don't call them similar?

The WITNESS. The snap?

Judge KINCHELOE. The swivel. You don't call your swivel similar to this?

The WITNESS. Yes, sir; because they are used for the same purpose.

Judge KINCHELOE. Do you think things are similar because they do the same thing, or are used for the same purpose?

The WITNESS. Not always.

\* \* \* \* \* \* \*

Q. Is it your opinion that the snap and swivel in the article which you have produced are interchangeable in use with the imported snaps and swivels of similar size to which you have already referred?—A. Yes, sir.

\* \* \* \* \* \* \*

Q. Now, Mr. Trevethan, when you say your snaps and swivels are interchangeable with the imported snaps and swivels, what do you mean?—A. Well, that you can use either one of these for the same purpose.

Q. That for either a dog runner chain or any other item wherein you would employ such sizes of snaps and swivels?—A. Yes.

Mr. DONNELLY. I offer in evidence as Defendant's Illustrative Exhibit T this dog runner chain which is labeled 1/0.

\* \* \* \* \* \* \*

Judge KINCHELOE. You don't think that would hold a bull with a ring in his nose?

The WITNESS. This Number 1/0, we sell a great number of these in the South where they have small cattle.

Judge KINCHELOE. Where do you think they have big dogs?

The WITNESS. There are not so many sold in that size runner.

\* \* \* \* \* \* \*

The article was then admitted in evidence as defendant's illustrative exhibit T, as in the case of all the other illustrative exhibits over the objection of counsel for the plaintiffs.

At this juncture catalog 36 of the American Chain Co. was admitted in evidence as defendant's illustrative exhibit U, the witness indicating various items on pages 98, 100, 101, 102, 103, and 105 manufactured and sold by his company involving snaps and swivels. At the same time a sample of a tie-out chain manufactured by the witness' company was admitted in evidence as defendant's illustrative exhibit V, and a dog chain manufactured by said company with a snap similar to plaintiffs' exhibit 7 was admitted in evidence as defendant's illustrative exhibit W.

The witness then testified that of the weldless chains manufactured and sold by his company, 12 per centum were sold for tie-out or cow chains, and 54 per centum as dog chains; and that the same proportion would apply to the years previous to 1930.

On cross-examination the witness testified in part as follows:

X Q. Is it true that the American type of snap and swivel are different from the imported snaps and swivels?—A. Different?

X Q. In shape.—A. We have already seen that; the swivels and the snaps are different in design, but in application there is no difference.

\* \* \* \* \* \* \*

X Q. Please look carefully at this sample, Illustrative Exhibit S. That is what you term a dog runner chain.—A. Yes.

\* \* \* · \* \* \* \*

X Q. Isn't it a fact that your dog runner chain and tie-out chain are identical with the exception of the length?—A. No, it is not.

\* \* \* \* \* \* \*

X Q. Just the chain part is the same?—A. The chain part only.

X Q. The chain part is identical?—A. Exactly the same.

\* \* · \* \* \* \*

X Q. Isn't it true that at least 90 per cent of the chains you sell as dog chains are lighter than Illustrative Exhibit S?—A. Yes, dog chains.

X Q. Isn't it a fact your company makes dog chains not in excess of 10 gauge, while tie-out chains are made up to 8 gauge?—A. Well, we manufacture all those sizes, but I don't carry them all in my mind.

\* \* \* \* \* \* \*

X Q. What is the average size of chain used by your company for tie-out or picket chains?—A. Just the same as your company. \* \* \* .

\* \* \* \* \* \* \*

X Q. Is it correct your records indicate that more tie-out and halter chains are sold than dog runner and kennel chains?—A. It would be nearly an even break, probably a little in favor of the dog runner and kennel chains.

\* \* \* \* \* \* \*

X Q. Your Number 1 dog runner and your Number 1 tie-out chains are exactly the same?—A. Yes, the same size chain.

\* \* \* \* \* \* \*

At the third and last hearing, held at Cincinnati on April 29, 1941, the plaintiffs offered in evidence in rebuttal the testimony of two witnesses. The first, John M. Schaumloffel, who was recalled, testified in part as follows:

R. Q. In the course of your business experience, have you ever used the larger-sized swivels, like your Exhibits 2 and Illustrative Exhibit A, that is, manufacturer's sizes 35, 35/40, and 40, for any purpose other than either in the manufacture of picket or tie-out chains, or cow chains?—A. I have not.

R. Q. Referring, now, to the larger size imported snaps, your Exhibit No. 5, manufacturer's size 35 or 35a, in the course of your business experience extending over the period of the last twenty-two years or more, have you ever used such larger sized snaps for any purpose other than either picket or tie-out, or cow chains?—A. I have not.

R. Q. Have you a sample of your lighter weight, No. 1, cow chains which you manufacture?—A. I have.

\* \* \* \* \* \* \*

(The witness then produced a sample which was, over the objection of counsel for the defendant, admitted in evidence as plaintiffs' illustrative exhibit Y).

R. Q. With the cow chain No. 1, such as Illustrative Exhibit Y, what size snaps and swivels do you use?—A. On the No. 1 we use a No. 25 snap and No. 27 swivel.

R. Q. That is a 25 snap, which is your Exhibit 7, and 27 swivel, which is your Exhibit No. 4?—A. Right.

R. Q. Are the snaps and swivels on your No. 1 cow chain, Illustrative Exhibit Y, the same as or different from the snaps and swivels on the Hodell cow chain, Illustrative Exhibit L?—A. No, I think they are the same.

*　　*　　*　　*　　*　　*　　*

R. Q. How about the bending qualities of the two?

Mrs. Bennett. I object, your Honor; the witness has not been qualified as a technical witness.

Mr. Tompkins. He has been engaged in the business a great many years. He ought to know as well as anybody.

By Mr. Tompkins.

R. Q. Can you determine the quality of that material by any test you can now make? Yes or no.—A. Yes.

R. Q. Please do so.

*　　*　　*　　*　　*　　*　　*

R. Q. Explain what you are doing.—A. The tensile strength is determined by bending our snap and bending the other to see which one has the highest carbon content and strength.

R. Q. Do that.

By Judge Dallinger.

Q. What have you got in your hand there you are going to test with?—A. A pair of pliers to take hold.

Q. How large are the pliers?—A. It is a No. 8 Barnes pliers.

Q. Proceed with your test and see what you find. Which one are you testing?—A. I am testing our No. 1 cow-tie.

Q. What is the number of the exhibit?—A. Exhibit Y. Now I have the Hodell.

Q. What is that exhibit number?—A. This is Exhibit L. I can only give the approximate difference in strength, and that is that our snap, 27 snap, has 25 per cent more strength than the one in the Hodell chain.

Mrs. Bennett. I move to strike that out. The witness is not qualified.

Judge Dallinger. Objection overruled.

Mrs. Bennett. Exception.

*　　*　　*　　*　　*　　*　　*

R. Q. Am I correct in understanding that that Exhibit No. 7 is the very lightest weight snap on which you are claiming?—A. That is the lightest snap we have discovered.

*　　*　　*　　*　　*　　*　　*

R. Q. Have you a domestic tie-out chain which you purchased recently?—A. I have.

R. Q. Please produce it. (Witness produces sample which was admitted in evidence as Plaintiffs' Illustrative Exhibit Z). I note that on this bag which contains the chain which you now produce appear the figures "One only Buckeye Tie-Out Chain," also the figure "1/0." Was that on the bag when you purchased it and the chain was in it?—A. Yes, sir; it was in it.

R. Q. What does that term, "Buckeye Tie-Out Chain," indicate?

Mrs. Bennett. I object.

By Mr. Tompkins.

R. Q. If you know.—A. Yes.

R. Q. How do you know?—A. Why, the records and catalogues and papers we have in our office, issued by the Bridgeport Chain Company. It is their trademark; "Buckeye" is their registered trademark.

R. Q. Is that one of your competitors?—A. That is one of our competitors.

R. Q. When, where, and from whom did you purchase this particular tie-out or Buckeye chain, 1/0?—A. At the retail stores of Sears, Roebuck & Company, of this city.

R. Q. What did you ask for when you went in?—A. Asked for No. 1 tie-out chain.

\*   \*   \*   \*   \*   \*   \*

R. Q. How do the snaps and swivels on that Exhibit D compare with the snaps and swivels on Illustrative Exhibit Z?

\*   \*   \*   \*   \*   \*   \*

The Witness. Ours is two hundred nineteen one thousandths.

By Mr. Tompkins.

R. Q. And the Illustrative Exhibit Z is what?—A. Two hundred fifteen one-thousandths, four-thousandths difference.

R. Q. Well, for trade purposes, are they or are they not, in your judgment, identical or similar?—A. We would consider them identical.

\*   \*   \*   \*   \*   \*   \*

R. Q. In the present case, Mr. Diel, one of the Government witnesses, testified, Record Page 68, that the diameter of any given wire or wire article does not, by itself, determine the strength of the article, or that it does, by itself, determine the strength of the article. Do you agree or disagree with Mr. Diel's testimony?—A. I disagree.

R. Q. Why?—A. Because the tensile strength of anything is determined by the character of the material from which it is formed.

R. Q. Rather than by the diameter?—A. Rather than by the diameter.

By Judge Dallinger.

Q. That has been your experience in testing these chains?—A. It has.

By Mr. Tompkins.

R. Q. Have you with you any samples by which you can demonstrate to the court the accuracy of your statement on that point?—A. I have.

\*   \*   \*   \*   \*   \*   \*

The Witness. Well, here are two pieces of metal from which snaps are made. The larger piece measures two hundred fifty-one-thousandths, the thin piece is one hundred eighty-five one-thousandths, and from the test at our factory the small piece has 40 percent more strength than the large piece.

By Judge Dallinger.

Q. Were you present when the test was made?—A. Yes. It was by our firm, the Cincinnati Pump Manufacturing Company. Myself and an assistant were present.

Q. What did you use?—A. The bending test, the pressure it takes to bend each piece.

Q. Did you use a machine for that purpose?—A. It registers and counts the resistance, and also how many times.

Q. It is a machine for that purpose?—A. A tool made for that purpose, testing tensile strength.

Mr. Tompkins. I offer these two pieces in evidence and ask that they may be marked with an appropriate collective Exhibit number.

Mrs. BENNETT. The Government objects on the ground that the witness' qualifications haven't been shown, and on the ground that there has been no showing how he knows that these particular pieces are illustrative of metal used for the making of swivels or snaps which he testified about.

Judge DALLINGER. You had better qualify him.

By Mr. TOMPKINS.

R. Q. How do you know?—A. Because we use this metal in manufacturing our snaps and swivels.

By Judge DALLINGER.

Q. In your own concern?—A. Yes.

Judge DALLINGER. Objections overruled.

Mrs. BENNETT. Exception.

Judge DALLINGER. They may be marked as a collective exhibit.   [The articles referred to were received in evidence and marked Plaintiffs' Illustrative Collective Exhibit AA, Protests 969713–G, etc., of this date.]

By Mr. TOMPKINS.

R. Q. Now, have you with you also two snaps made of material like that of Illustrative Exhibit AA which illustrate the point that one of greater diameter may be weaker by reason of the material it contains than one of smaller diameter?—A. I have two snaps here.   One is made from a larger piece, but I am not sure about the smaller snap, if it is made from the same material.

R. Q. Is it made from smaller material?—A. Smaller material.

R. Q. And what do you say about the strength?—A. The snap made from the smaller material has more strength than the larger snap.

R. Q. You have tested that to determine it, using your machine for that purpose?—A. I have.

Mr. TOMPKINS. I ask that that be marked Collective Illustrative Exhibit BB.

Mrs. BENNETT. The same objection.

Judge DALLINGER. And the same ruling.   Objection overruled.

Mrs. BENNETT. Exception.

  *          *          *          *          *          *          *

[The articles referred to were received in evidence and marked Plaintiffs' Collective Illustrative Exhibit BB, Protests 969713–G, etc., of this date.]

  *          *          *          *          *          *          *

R. Q. Well, what have you done and what have you found out about the character and quality of the metal of your imported snaps and swivels?

  *          *          *          *          *          *          *

By Judge DALLINGER.

Q. What have you done?—A. To put these things in a vise and count the breaking point.

  *          *          *          *          *          *          *

By Mr. TOMPKINS.

R. Q. What did you find the grade of material to be in these imported snaps and swivels?

  *          *          *          *          *          *          *

The WITNESS. The only thing I can say is that it is a very high-grade material used, and very strong snaps.

  *          *          *          *          *          *          *

R. Q. Has your firm ever had a complaint regarding the size of snap or swivel used in your chains?—A. We never have.

R. Q. What, if any, commendation have you received from your customers regarding the construction of your snaps or swivels?—A. We have had some very favorable comments regarding their construction.

\*     \*     \*     \*     \*     \*     \*

R. Q. Over what sections have your sales extended?—A. We sell tie-out chains in almost every state in the Union. The principal or largest section is the southern half, from coast to coast, the grazing districts.

R. Q. I believe you have already testified that only a very small or insignificant percentage of your imported snaps and swivels ever go into the making of dog runner chains or dog chains, and that at least 98 per cent of such snaps and swivels are used in tie-outs or picket chains and cow chains. Now, in this small percentage of dog runner chains and dog chains that you do manufacture, what size are they and what type of snaps are attached?—A. Dog runner chains or kennel chains, not very many are sold, but what are are No. 2 and lighter chains.

R. Q. What kinds of snaps?—A. I say your dog chains are different type chains and different type snaps.

R. Q. Have you a card exhibit showing the various types of the dog chains that you manufacture?—A. I have.

R. Q. Please produce it. [Witness produces sample.]

\*     \*     \*     \*     \*     \*     \*

By Judge DALLINGER.

Q. You say the big majority of the dog chains you make are like that on the card?—A. 99 per cent.

Judge DALLINGER. It may be marked. Objection overruled.

Mrs. BENNETT. Exception.

[The articles referred to were received in evidence and marked Plaintiffs' Collective Illustrative Exhibit CC, Protests 969713–G, etc., of this date.]

By Mr. TOMPKINS.

R. Q. Are there any swivels on these dog chains, of the collection now marked Plaintiffs' Collective Illustrative Exhibit CC?—A. No.

R. Q. That is, no separate swivels?—A. No.

R. Q. But there is a smaller half-swivel attached to the snap in each case; is that right?—A. There is.

R. Q. How about the snaps? Are they the same as or different from your imported snaps, Exhibits 5, 6 and 7?—A. That is an entirely different snap.

R. Q. Please explain that a little more in detail.—A. The construction of the snap that we use on the dog chain is entirely different. It is attached different and it opens different. Your hook and your spring is all one piece, made from the same piece of material, while your other snaps, such as are used in tie-out chains, are made of five different pieces. The main part of this dog chain snap is made up of one  \* \* \*  piece, rolled steel, while these here [indicating], the style snap that we use on the tie-out chain, are made up of five pieces, and it requires the use of a rivet to attach it.

R. Q. Now, are any of those dog chains on Illustrative Exhibit CC what you term dog runner chains or not?—A. These are all straight dog chains.

R. Q. But, now, you also manufacture some dog runner chains?—A. We do.

\*     \*     \*     \*     \*     \*     \*

R. Q. You say that this, the chains on Illustrative Exhibit CC, represents about 99 per cent of all dog chains you handle?—A. 99 per cent.

R. Q. So the other 1 per cent would cover your dog runner chains?—A. Dog runner chains.

R. Q. Now, on that 1 per cent of dog runner chains have you a sample showing the type of snap and the attached swivel which you use on those? Yes or no.—A. No. * * *.

\* \* \* \* \* \* \*

R. Q. Have you a sample with you of the type of snap and swivel attached which is used on the dog runner chains? Yes or no.—A. I have a chain, yes.

R. Q. Produce it, please. [Witness produces sample.] That is your dog runner chain?—A. Yes, sir.

\* \* \* \* \* \* \*

[The article referred to was received in evidence and marked Plaintiffs' Illustrative Exhibit DD, Protests 969713–G, etc., of this date.]

\* \* \* \* \* \* \*

R. Q. Have you a sample which represents the smaller snap which you say is of the same style that you use for dog runner chains?—A. Yes, sir, what you have there.

\* \* \* \* \* \* \*

R. Q. And you are not claiming on any snaps as small as that?—A. We are not.

\* \* \* \* \* \* \*

[The article referred to was received in evidence and marked Plaintiffs' Illustrative Exhibit EE, Protests 969713–G, etc., of this date.]

R. Q. How does the tensile strength of the chains which you sell as dog chains or dog runner chains compare with the strength of the chains which you sell as tie-out or picket or cow chains, if you know?

\* \* \* \* \* \* \*

A. The snaps and swivels used in the tie-out chains are much stronger than those used in dog or dog runner chains.

On recross-examination the witness testified in part as follows:

R. X Q. * * *. Tie-out chains, Mr. Witness, are for any animal, are they not?—A. The purpose for which we sell them and the purpose for which they are used, as far as we know, is for tieing out cows, cattle.

R. X Q. But you make a distinction between the term "tie-out chain" and "cow chain," don't you?—A. A tie-out chain is formed different from a cow chain.

R. X Q. So that a tie-out chain does not refer exclusively to a cow chain?—A. Does not refer to a cow-chain at all. A tie-out is used to tie-out grazing animals, and the other is used in the stable.

R. X Q. So a tie-out chain could be used for any animal?—A. Could be used for any animal.

\* \* \* \* \* \* \*

R. X Q. Are southern cows smaller than northern cows?—A. The cows in the south, as far as tie-out chains are concerned——

R. X Q. Please answer the question. Are the southern cows generally smaller than northern cows?—A. In the Southeast, yes.

\* \* \* \* \* \* \*

R. X Q. For the larger cows, like the Holsteins, you use a larger chain and stronger swivel than for the small cows; is that right?—A. That is right.

R. X Q. I show you the Illustrative Exhibit Z, which is marked on the back, "Buckeye" [handing to witness], and ask you if, in your judgment, that chain will hold a heavy Holstein cow?—A. Yes; the tensile strength of the No. 1/0 chain is, I think, about 1120 pounds.

R. X Q. That is the answer. Would that chain hold a bull with a ring in its nose?—A. For that purpose, it would be too strong. A very light chain would do for a bull with a ring in its nose.

The second witness called by the plaintiffs in rebuttal, Edward F. Hoge, manufacturer's sales agent in the employ of H. H. Deveney & Co. of Atlanta, Ga., testified that for the last 18 or 20 years he had purchased and sold throughout 14 Southern States picket tie-out and cow chains; that in his experience the smaller sizes of such chains were the best sellers, constituting 95 per centum of his sales of cow chains and tie-out chains.

On cross-examination the witness testified that his statements were based only upon sales to wholesale hardware dealers.

The Government, in rebuttal, offered the testimony of Clifford Petersen, who testified that he had been a farmer in the State of Indiana; that on his farm were Holstein and Hereford cattle; that he had been accustomed to use tie-out chains as heavy as illustrative exhibit D and usually heavier than illustrative exhibit B. Being shown the plaintiffs' different exhibits he testified that plaintiffs' illustrative exhibits C and F are the only ones that would have been acceptable to him to hold any of his cows.

On cross-examination it developed that the witness had been in the Government service since 1927, first in the capacity of inspector of customs, and later as deputy collector of customs; and he testified that he knew nothing about the strength of illustrative exhibits B, C, D, or E.

Upon the entire record, including a careful examination of the numerous exhibits, we find as a fact that the snaps and swivels constituting the imported merchandise at bar are chiefly used as necessary and integral parts of picket, tie-out, or cow chains, which in turn are chiefly used to picket or tie-out cows and other grazing animals on the farm, which of course is an agricultural use within the meaning of paragraph 1604 of the Tariff Act of 1930.

Hence, on the established facts and the law applicable thereto as judicially enunciated in many decisions of this court and the United States Court of Customs and Patent Appeals it must be held, and we do hereby hold, that the 20,000 swivels valued at 20.50 marks per thousand and contained in cases 3883 and 3884 as shown on the invoice accompanying entry 1660 covered by protest 969713–G, and the swivels represented by items 35/40, 30, and 27, and the snaps by items 35a, 30a, and 25 and described in the first six items on the invoice accompanying entry 490 covered by protest 6025–K, are parts of agricultural implements and as such properly entitled to free entry under said paragraph 1604, as alleged by the plaintiffs. That claim is therefore sustained; but as to all other merchandise the

claims are overruled. *United States* v. *Boker & Co.*, 6 Ct. Cust. Appls. 243, T. D. 35472; *United States* v. *Ducommun Hardware Co.*, 7 Ct. Cust. Appls. 353; T. D. 36904; *United States* v. *Irwin & Co.*, 7 Ct. Cust. Appls. 360, T. D. 36906; *United States* v. *Spreckels Creameries, Inc.*, 17 C. C. P. A. 400, T. D. 43835; *United States* v. *S. S. Perry*, 25 C. C. P. A. 282, T. D. 49395; and *Wilbur-Ellis Co.* v. *United States*, 26 C. C. P. A. 403, C. A. D. 47.

Judgment will be rendered accordingly.